# THE SUPREME COURT

OF

# PENNSYLVANIA.

126   1
135   440
126   1
160   388
126   1
19 SC   309
126   1
f215   ²512

EASTERN DISTRICT—PHILADELPHIA, 1889.

## READING & POTTSVILLE R. CO. v. BALTHASER.

ERROR TO THE COURT OF COMMON PLEAS OF BERKS COUNTY.

Argued March 7, 1889—Decided April 29, 1889.
[To be reported.]

1. On the trial of an issue to determine the injuries to land from the construction of a railroad, it was drawn from a witness for the plaintiffs, on cross examination, that a portion of the land was under lease to a tenant; it then became competent for the plaintiffs to explain by another witness in chief that the land leased was not touched by the railroad appropriation.

2. In such a proceeding, the land having its chief value in a quarry of limestone it contained, testimony offered by the plaintiffs to show where the yield of the quarry had been marketed, or what method of transportation had been employed, before the construction of defendant's railroad, was irrelevant and inadmissible.

3. But where the testimony was admitted, and the subject of the modes and cost of transportation in former years opened, it was error to refuse testimony afterwards offered by the defendant to show that rates of freight by rail had been reduced in consequence of the new facilities offered by the building of defendant's road.

4. The true inquiry was, whether a broader market and better facilities for shipment were put within reach of plaintiffs by the building of defendant's road; in other words, whether there were advantages to be set off against the disadvantages arising from the appropriation of the plaintiffs' land for right of way.

(a) Witnesses for the plaintiffs having testified to estimates of injuries the same in amount they had testified to, on a former trial, when impro-

Statement of Facts.

perly including consideration of the value of limestone beneath the rail-
road appropriation, on which account the judgment on the former trial
was reversed,

5. It was error to exclude inquiry on cross examination whether they
had not made a new arrangement of the elements of the damage so as
to enable them to fix the damages at the same total as before, but by a
different process, and this in consequence of the reversal of the former
judgment.

6. The lapse of time from the date of the injury to the date of trial is
a proper subject to be considered by the jury in making up their verdict,
but it is error to instruct the jury to allow interest eo nomine upon the
amount of damages they find from the date of the injury.

Before PAXSON, C. J., STERRETT, WILLIAMS, McCOLLUM
and MITCHELL, JJ.

No. 286 January Term 1889, Sup. Ct.; court below, No. 47
November Term 1885, C. P.

The proceeding below was the trial of an issue between
Mary Balthaser, widow, Frank Balthaser and others, children
and devisees of William Balthaser, deceased, as plaintiffs, and
the Reading & Pottsville Railroad Company, now the Penn-
sylvania Schuylkill Valley Railroad Company, as defendants,
formed in an appeal from a report of viewers in the assessment
of damages to land.

A judgment entered upon the verdict of a jury returned on
April 18, 1887, in favor of the plaintiffs for $8,040.64, was
reversed in this court on April 2, 1888, the case being re-
ported: R. & P. R. Co. v. Balthaser, 119 Pa. 472.

The record having been returned, the cause was again called
for trial on September 19, 1888. Mary Balthaser called for
plaintiffs, testified to the death of William Balthaser, her
husband, gave the names of the children, and stated that she
was in possession of the premises in 1885, when the railroad
was located thereon. On cross-examination by defendant's
counsel, she stated that at the time the railroad was located,
Atkins Brothers, under a lease made to them by herself and the
heirs, were operating a quarry upon the premises.

Walter W. Balthaser, a son of William Balthaser, and one of
the plaintiffs, was called, and testified that he had transacted
the business with Atkins Brothers with reference to the lease
referred to.

Statement of Facts.

Mr. Ruhl, for the plaintiffs, proposed to ask the witness whether it was a written or an oral lease, the purpose being to identify the part of the tract leased to Atkins Brothers and the tenure by which it is held.

Mr. Derr: Objected to by defendant, (1) because there is no lease described in the petition, which must be regarded as the plaintiffs' declaration in this case; and as evidence offered in chief by the plaintiffs it is objectionable, because it creates a variance between the case described in the petition and that offered in the oral testimony; (2) it is generally irrelevant and inadmissible.

By the court: Objection overruled; exception.[1]

The witness testified that in 1885, when the railroad was located, Atkins Brothers were operating a quarry on a portion of the tract, not touched by the railroad appropriation, under a verbal continuance of a written lease the term of which had ended in 1883.

The same witness testified that the plaintiffs carried on the business of quarrying and selling stone and burning lime.

Q. State where you sold your stone and how they were shipped?

Objected to, as being incompetent and irrelevant, in chief.

Mr. Ruhl: The purpose of this question is to show by the witness that the market for the plaintiffs' stone was in Schuylkill county, along the line of the Schuylkill canal. The law requiring the witness to weigh the advantages against the disadvantages, the purpose of this offer is to show that there are no advantages to this property by reason of the location of the road, so far as shipping of stone is concerned, and as bearing upon the market value of the property at the time of the appropriation by the railroad company.

By the court: Objection overruled; exception.[2]

The witness then testified that the most of the stone was shipped by the Schuylkill canal, and that in hauling the lime to the wharf they could make about twenty trips per team a day, about twenty bushels per load, and were not required to have a driver; that after the location of the railroad, not so many trips could be made in a day, and not so large loads could be taken, and drivers were necessary.

Cross-examined:

Statement of Facts.

Q. At the time of the construction of the defendant's railroad you had the canal as a means of transportation and the Moselem branch of the Philadelphia & Reading Railroad? A. Yes, sir. Q. That is the small branch of railroad that comes over from near Leesport across the bridge to the quarry? A. Yes, sir. Q. The canal has recently been abandoned beyond Schuylkill Haven?

Objected to, as immaterial and as not cross-examination.

By the court: On cross-examination the defendant is confined to the condition of transportation at the time of the location and construction of the road.

Q. Do you know that the Philadelphia & Reading Railroad Company, who own that branch across the river, previous to the construction of the defendant's railroad charged fifteen cents per ton across to Leesport?

Objected to.

Mr. Derr: This question is proposed to be followed by a question as to whether the Philadelphia & Reading Railroad Company did not, after the construction of the defendant's railroad, discontinue making the said charge, and carry the freight to Leesport free.

Objected to as not cross-examination.

By the court: Objection sustained; exception.[3]

The same witness, continuing, made the depreciation of the market value of the tract, as affected by the location of the railroad, to be $12,000. This was the amount of damages estimated by the witness on the former trial.

Cross-examined:

Q. When you testified before, you made the damages $12,000 too; did you not? A. Yes, sir. Q. And in that estimate you included the stone that you said the railroad company took; did you not? A. That was one way of itemizing the damages, but this is in a different way. Q. You included the stone that the railroad company took in the other estimate? A. That was one way to estimate the value of this property. Q. You know that the Supreme Court decided that we could not be charged with the taking of stone; do you not? A. Not a stone land. Q. Do you not know that the Supreme Court, since the other trial, have decided that you cannot charge us and cannot claim from us for taking stone? A. No, sir.

Objected to.

Mr. Derr: It is now proposed by the defendant to ask the witness upon the stand upon cross-examination as to whether he does not know that the Supreme Court after the other trial decided that the plaintiffs could not claim anything from the defendant for any alleged taking of stone, and as to whether he has not modified his mode of making up these damages in consequence of that decision, and in order to get around that decision, leaving the amount of his estimate the same, but pretending to get at it in a different way.

Mr. Ruhl: Objected to by plaintiffs, because it is immaterial and irrelevant. The witness cannot be asked to construe the decisions of the Supreme Court; the Supreme Court never decided that.

By the court: You can inquire as to whether his estimate is different from what it was at the last trial, with a view to contradiction. I do not think you should inquire what the Supreme Court has decided. You may inquire as to whether he changed his estimate. The objection is sustained; exception.[5]

Other witnesses, called for the plaintiffs, presented estimates of damages in the same amounts as were their estimates on the former trial, from which it was claimed by the defendant that the witnesses must have taken into consideration the value of the limestone under the appropriation, as an element of the injuries.

The court, HAGENMAN, P. J., charged the jury and answered the points presented as follows:

A number of points are submitted to the court by counsel on both sides, and before referring to the evidence I will take up these points and answer them. After that, I will refer to the evidence.

The plaintiffs' points are as follows [inter alia]:

1. The value of plaintiffs' land as limestone land is a proper subject of consideration in estimating the damages; if the jury find that the plaintiffs' tract is limestone land, and has a greater market value on that account than for farming purposes, its value as such limestone land should be considered by the jury in estimating the damages plaintiffs' land sustained by reason of the location and construction of defendant's railroad upon it.

Charge of Court below.

Answer: This point is affirmed.

2. The value of plaintiffs' land must not be limited to, or measured by, a particular use; it is its general market value for any purpose that will induce persons to purchase, which is the true test. The use to which the property has been or may be applied is proper for the consideration of the jury, in the estimate of its value; its adaptation for any particular purpose may enhance its market value. If plaintiffs' property, by reason of its location, or otherwise, is especially adapted to any particular use to which it is applied, if it is worth more for that particular use than for any other, its market value must be measured accordingly.

Answer: This point is affirmed.

The defendant's points are as follows:

1. The petition in this case describing the plaintiffs' property generally, without excluding therefrom or mentioning the outstanding leasehold interest which Mary Balthaser and Walter Balthaser, two of the plaintiffs, admitted was vested in Atkins Brothers as to part of the said property at the time of the appropriation, there can be no recovery under the pleadings and evidence in this case.

Answer: This point is answered in the negative.[8]

*        *        *        *        *        *        *        *

7. It is impossible to place a value upon the limestone underlying, or supposed to underlie, the defendant's railroad, because neither the quantity nor the quality thereof can be determined; the law, therefore, will not permit the plaintiffs to charge the defendant with the supposed value of such stone, either directly at so much per ton, or indirectly by making the supposed quantity or value thereof a basis of estimating the market value of the land taken; and the estimates of all the plaintiffs' witnesses, excepting Reuben Wanner, being based upon that theory, such estimates must be disregarded by the jury.

Answer: This point is affirmed.

9. The jury are to estimate the damages in this case by the difference in the market value of the plaintiffs' property before and after the construction of the railroad, as affected thereby; they are not to allow more damages because the property was taken without the plaintiffs' consent, nor because it was taken by a railroad company; but they are to make their estimate

Charge of Court below.

just as they would if the plaintiffs voluntarily agreed to part with their property for a reasonable compensation, and if they had so agreed to part with it to an individual to be used for the same purposes and in the same manner.

Answer: This point is affirmed, if the reasonable compensation is the market value of the property.[9]

These are all the points which have been submitted; and we say to you again that the rule which shall govern you when you come to consider this case in your room, is what was the market value of this property before the railroad was constructed over it, that is, immediately before; and what was the market value of the property after the railroad was constructed over it. The difference, if any, is the true measure of damages which the plaintiffs would be entitled to recover.

[What, then, is the evidence? A number of witnesses were examined upon the part of the plaintiffs, and the damages which these witnesses have testified to that the property has sustained, that is, the difference in the market value, ranges from $5,000 to $12,000. The first witness examined was Walter W. Balthaser, and he estimates the damage to the property at $12,000. Isaac H. Rahn was the next witness, and he says $9,000. Francis Kaufman names $9,000. Reuben Wanner says $5,000. Conrad Hock names $9,000. William Grater says $9,000. George C. Hartman says $7,000. Harrison Epler says $8,000. You see these several witnesses vary in their estimate of the difference in the market value of the property. You are to take their testimony, examine it and weigh it. You have been upon the premises, and you yourselves have seen the property, and therefore you will weigh the testimony in connection with what your own eyes have seen.][7]

In regard to the testimony of the plaintiffs' witnesses, in speaking of the limestone, some of them referred to what they had testified to on the former trial about having made some kind of computation of the amount of stone which underlay the railroad. So far as any testimony of that kind fell from the lips of the plaintiffs' witnesses, it must be disregarded by the jury. The jury do not calculate, nor take into account, the quantity of limestone which underlies the railroad. The only consideration which the jury can give to the testimony of the witnesses examined upon the part of the plaintiffs is, what

Charge of Court below.

was this property worth in the market before and after the construction of the railroad? If it be limestone land, limestone land that is to be used in the manner in which this property has been used, it is more valuable than farming land. But the jury must disregard any estimate which any witnesses may have made of the quantity of limestone which underlies the railroad.

\* . \* \* \* \* \* \* \*

[After you have once ascertained that there is any damage, you will allow interest upon that sum from May 19, 1885, to the present time.] [10]

My attention has been called to the seventh point of the defendant, and I will read it again, and then say to you what I have to say in regard to it.

7. It is impossible to place a value upon the limestone underlying, or supposed to underlie, the defendant's railroad, because neither the quantity nor the quality thereof can be determined; the law, therefore, will not permit the plaintiffs to charge the defendant with the supposed value of such stone, either directly at so much per ton, or indirectly by making the supposed quantity or value thereof a basis of estimating the market value of the land taken, and the estimates of all the plaintiffs' witnesses, excepting Reuben Wanner, being based upon that theory, such estimates must be disregarded by the jury.

This point we affirmed, and we say to you now, that all the testimony from any part of the plaintiffs' witnesses who spoke of valuing the limestone underlying the railroad, must be disregarded by the jury, and the testimony of those witnesses must be taken, not to the stone underlying the railroad, but what was the true market value; and if their market value that they testified to has reference to the limestone which underlies the railroad, and making that a special part of the difference in the market value, that must be disregarded by the jury.

The jury returned a verdict in favor of the plaintiffs for $6,975.51. A rule for a new trial having been discharged, the defendant took this writ, assigning for error, inter alia:

1, 2. The admission of the plaintiffs' offers.[1] [2]

3, 5. The refusal of the defendant's offers.[3] [5]

7. The portion of the charge embraced in [ ] [7]

8, 9. The answers to the defendant's points.[8] [9]

10. The portion of the charge embraced in [ ] [10]

*Mr. Cyrus G. Derr*, for the plaintiff in error.

*Mr. C. H. Ruhl* (with him *Mr. Daniel Ermentrout* and *Mr. Adam B. Reiser*), for the defendants in error.

OPINION, MR. JUSTICE WILLIAMS:

The admission of the evidence complained of in the first assignment of error was entirely proper as the case stood at the time. The defendant's counsel had, by their cross-examination, drawn from Mary Balthaser the statement that the Messrs. Atkins were operating the quarry on the lands of the plaintiffs at the time the railroad was located upon them, under a lease from herself and children. In order to explain this answer and show that the lease to Atkins did not affect the plaintiffs' right to recover, one of the sons who made the lease was called, for the purpose of showing that the lease covered but a small part of the quarry and that the railroad did not touch or affect the part so occupied by the Atkins. This was no necessary part of the plaintiffs' case, and became important only because of the cross-examination of Mary Balthaser and for the purpose of explaining it. For that purpose it was competent and relevant.

The second assignment raises a very different question. When the quarry was opened originally it would seem that the canal was the only available line of transportation for its products. The Reading railroad afterwards built a branch across the Schuylkill river in the neighborhood of the quarry, but charged an additional rate of ten cents per ton on all freight passing over this branch, so that shipment of heavy freight over this line does not seem to have been desirable for the owners of the quarry. The defendant's road was built to and across the plaintiffs' lands. Whether this additional line of transportation was or was not an advantage to the owners of the quarries was a proper subject for consideration by the jury, but the evidence referred to in this assignment threw no light upon that question. It was not important for the jury to know

where the yield of the quarry had been marketed in years gone by, or what line of transportation had been employed before the new facilities were offered to its owners. The true inquiry was, whether a broader market and better facilities for shipment were put within their reach by the building of the defendant's road; or, in other words, whether there were advantages to be set off against the disadvantages arising from the appropriation of the plaintiffs' land for the right of way of this road. The objection to this evidence should have been sustained. The inquiry which it entered upon was not helpful or relevant. But as the court admitted it, and so opened the subject of the modes and cost of transportation existing in former years, it is not easy to see on what ground the defendant's offer, the rejection of which is the subject of the third assignment, was excluded. The offer was to show that rates of freight by rail had been reduced in consequence of the building of the new road. If this subject of freights had not been opened, the rejection of this offer would have been right. Having let the plaintiffs into this sort of proof, the defendant should have been permitted to reply. The door should have been closed to both.

The fifth assignment is also well taken. On a previous trial of this case witnesses were allowed to estimate the damages sustained by the plaintiffs by calculating the number of tons of limestone under the surface of the right of way, and multiplying that by the estimated price per ton, reaching a value of several thousands of dollars per acre. This was one of the reasons for the reversal of the judgment by this court and sending it back for another trial. We held that such a method for fixing the value of land was speculative, and could not be applied to land taken by virtue of the right of eminent domain. It involves an uncertain estimate of the quantity and quality of the stone, includes necessarily the use of labor and capital, requires skill and intelligent supervision on the part of the operator, and vigilance and success in the financial management. No human mind can foresee the presence of these elements of business success, or forecast the profit or loss of actual operations, if the stone be removed at the ordinary rate of quarrying. The true rule is that which quits the realm of speculation and comes down to what is within the know-

ledge of business men living in the neighborhood, viz., what was the fair selling value of the property before the defendant entered upon it? What is its fair selling value as affected by that entry? The difference is the true measure of the loss sustained by reason of the entry. But notwithstanding the plain manner in which this rule was stated when this case was here before, the witnesses on the last trial placed their estimates of the plaintiffs' damages at the same sums as when they were examined on the former trial. Defendant's counsel asked them on cross-examination whether they had not made a new arrangement of the items or elements of the damage so as to enable them to fix the damages at the same total as before, but by a different process, and whether this was not done in consequence of the decision of this court holding that the value of the stone in place could not be fixed by the ton, and the total so reached taken as the market value of the land. This the court excluded. It was, however, a proper cross-examination. It reached after the real basis on which the witnesses made their estimate, and it afforded a test of the fairness and candor of the witnesses themselves. It was in no sense an examination upon a legal question, or upon the manner in which the witnesses understood the rule laid down by this court, but into the reason on which they acted. Knowing that they had no right to make their estimate now as they had made it before, had they not, nevertheless, done so, and given a false color to their testimony? This was the force of the examination proposed, and it was clearly within the lines of legitimate cross-examination.

The errors assigned to the charge upon the subject of the duty of the jury in the ascertainment of the damages cannot be sustained. The rule was correctly stated by the learned judge. He said: "All the testimony from any part of the plaintiffs' witnesses who spoke of valuing the limestone underlying the railroad must be disregarded by the jury, and the testimony of these witnesses must be taken, not to the stone underlying the railroad, but what was the true market value; and if their market value that they testify to has reference to the limestone which underlies the railroad, and making that a special part of the difference in the market value, that must be disregarded by the jury." This instruction is in accordance with the rule

laid down by this court. The jury may have disregarded it, but it was plainly presented to them. The remedy for a disregard of instructions is not upon writ of error, but by an application to set aside the verdict, which under proper circumstances the trial judge should not hesitate to do.

The ninth assignment relates to the direction to the jury to allow interest. This was technical error. The lapse of time between the happening of an injury and the time of trial is a proper subject to be considered by the jury in making up the amount of damages for which to render a verdict, but interest, as such, is not recoverable in actions ex delicto. In actions where a definite sum of money is demandable as a debt, interest at the legal rate is a matter of right, and the jury may properly be directed to include it in their verdict; but actions brought to recover unliquidated damages for a wrong done, proceed upon a different basis. The nature of the wrong, the attending circumstances, and the time when it was committed, are all for the jury, and may be properly considered in the adjustment of the amount of the verdict. The learned judge said to the jury: "After you have ascertained that there is any damage, you will allow interest on that sum from May 19, 1885, to the present time." This would have been an appropriate direction in an action ex contractu, because interest is a legal incident of a debt, but is not justifiable in an action of trespass. We might not have reversed for this alone, but as the case goes back for other reasons, we again call attention to this well-settled distinction between actions resting on contract and those growing out of a tort, so far as interest is concerned. In the former, interest is demandable as interest; in the latter, it is not. In the former, the court may properly direct its allowance; in the latter, the question belongs to the jury. It may, or it may not, enter into their calculation of the damages. Whether it shall or not depends on the judgment of the jury in view of all the circumstances of the case. If it is included in the verdict, it is simply as one element of the damages sustained by the plaintiff and liquidated by the verdict.

<div style="text-align: right">

The judgment is reversed, and a venire facias de novo awarded.